Albert SCHWARTZBERG and Sigmund Lefkowitz, Plaintiffs,

v.

Joseph CALIFANO, Secretary of the United States Department of Health, Education and Welfare et al., Defendants.

No. 78 Civ. 1039 (KTD).

United States District Court,
S. D. New York.

Oct. 26, 1979.

---

See also, D.C., 453 F.Supp. 1042.

Marvin L. Tenzer and James M. La Rossa, New York City, of counsel, for plaintiffs.

Robert Abrams, Atty. Gen. of the State of New York, New York City, for State defendants; Allan S. Moller, Asst. Atty. Gen., New York City, of counsel.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

This action was commenced by Albert Schwartzberg and Sigmund Lefkowitz as the owners and operators of two licensed health care facilities located in the Bronx seeking to enjoin the federal defendants, Joseph Califano and Jacqueline G. Wilson, and the state defendants, Barbara Blum and Robert P. Whalen,[1] from terminating

1. Plaintiffs have also sued Richard A. Berman, individually and as director of the Office of Health Systems Management of the Department of Health; William Liddle, individually and as Associate Director of the Facilities Surveillance Group of the Office of Health Systems Management; Earl M. Collier, Jr., individually and as Executive Director of the Office of Health Systems Management; Narsry Michelin, individually and as Acting Regional Coordinator for the New York City Area for the Long Term Care Unit of the Office of Health Systems Management; William Steibel, individually and as Deputy Commissioner of the Department of Social Services of New York State; Juanita Civillo, individually and as Nursing Consultant for the Office of Health Systems Management; Eugene Battenfield, individually and as Hospital Administration consultant for the Office of Health Systems Management [hereinafter collectively referred to as "the state defendants"].

the facilities' participation in the Medicare and Medicaid funding programs pending a pre-termination administrative hearing. The two health care facilities involved are the Kings Harbor Care Center [hereinafter referred to as "Kings Care"] and Kings Harbor Manor Facility [hereinafter referred to as "Kings Manor"].

The facts underlying the instant action, more fully set forth in my prior Opinion reported in D.C., 453 F.Supp. 1042, are as follows.

The plaintiffs were the owners and operators of two health care facilities [2] who in April, 1976, entered into "Provider Agreements" with the Department of Health, Education and Welfare [hereinafter referred to as "HEW"] and the New York Department of Social Services [hereinafter referred to as "DSS"] in order to secure Medicare and Medicaid funding for the health care services rendered to qualified patients.

The Medicare Program is a comprehensive health insurance plan through which the federal government provides health benefits to the aged and disabled. See 42 U.S.C. §§ 1395 et seq. The program is administered and funded exclusively by the federal government. However, its coverage is limited and consequently most older and disabled Americans must also avail themselves of Medicaid benefits. Medicaid, like Medicare, also provides health benefits to the aged and disabled. Unlike Medicare, however, this program is administered and funded jointly by the federal and participating state governments—of which New York is one. See 42 U.S.C. §§ 1396 et seq.

In order to secure Medicare and Medicaid funding, a Provider Agreement must be executed by HEW, DSS and the facility rendering health services for which funding is sought. An integral part of the Provider Agreement is that the health facility agrees to "maintain compliance with operating standards and to provide services in accordance with statutory provisions, rules and regulations in exchange for reimbursements for such services." Supplemental Complaint at ¶ 17.

The plaintiffs first entered into Provider Agreements with the HEW and the DSS in April, 1976. These Agreements were renewed in April, 1977. However, in March, 1978, HEW advised plaintiffs of its decision not to renew Kings Care's Provider Agreement for the period commencing April 1, 1978. As the record indicates, the decision not to renew was reached after HEW had inspected the facility and found numerous deficiencies in the facility and in the services being rendered to its patients.

Thereafter, the DSS followed suit and informed plaintiffs that it too would not renew its Provider Agreement with plaintiffs. This, however, was a foregone conclusion since the conditions of participation for Medicare and Medicaid reimbursements are identical. See 42 U.S.C. §§ 1395cc(c)2, 1396i(b). See also 45 C.F.R. 249.33(a)(10), dated October 1, 1976, which provides that facilities not approved for eligibility by HEW shall not be recognized for purposes of payment under Title XIX of the Social Security Act. Thus, HEW's decision to terminate the reimbursements mandated the identical response from the DSS.

Plaintiffs' supplemental complaint originally contained five claims for relief. The third, fourth and fifth claims charged that by terminating Medicare and Medicaid benefits without a prior administrative hearing, HEW and DSS had deprived plaintiffs of procedural due process. The state and federal defendants moved for summary judgment arguing that under the circumstances the Due Process Clause did not mandate a pre-termination hearing. I agreed and granted defendants' motion for summary judgment. In doing so, I found that plaintiffs' property interest would be sufficiently vindicated by means of a post-

---

**2.** In September, 1978, the New York Department of Health revoked the plaintiffs' operating certificates for Kings Care and Kings Manor. Thereafter, the plaintiffs commenced an action in Supreme Court, Bronx County, challenging the revocations. In February, 1979, the Commissioner of Health was appointed as involuntary receiver for the facilities which have been operating since this appointment.

termination hearing and directed that said hearing take place as soon as possible. The plaintiffs, however, have yet to seek such a hearing.[3]

Plaintiffs' first claim seeks redress under 42 U.S.C. § 1983. In particular, plaintiffs argue that the investigative techniques employed by HEW and DSS prior to their decisions to terminate reimbursement funding, constituted harassment and acted to prevent plaintiffs from conducting their business. They conclude that this conduct, under color of state law, deprived plaintiffs "of their property without due process of law and without compensation therefor." Supplemental Complaint at ¶ 24.

Plaintiffs' second claim seeks recovery under the National Health Planning and Resources Development Act of 1974, 42 U.S.C. §§ 300k *et seq.* [hereinafter referred to as either "the Act" or "the National Health Planning Act"]. The Act provides, in part, for the elimination of excess nursing home and health care facilities. It is urged that the conspiracy which is alleged to have existed between the state and federal defendants resulted in the closing of plaintiffs' facilities without compliance with the procedural requirements of the Act.

The state defendants now move for judgment on the pleadings or, in the alternative, for summary judgment with respect to plaintiffs' first and second claims. The plaintiffs oppose both motions and themselves move for a massive production of documents,[4] an order substituting counsel, and if defendants' motion is granted, plaintiffs seek leave to amend their complaint.

The state defendants oppose the motions to produce and to amend and have taken no position with respect to the request to substitute counsel.

The state defendants seek judgment as to plaintiffs' first claim on dual grounds. First, defendants argue that plaintiffs' 1983 claim fails to plead a constitutional violation with the degree of particularity required in this Circuit under *Powell v. Workmen's Compensation Board*, 327 F.2d 131, 137 (2d Cir. 1964). Second, defendants urge that even if the pleading is sufficient, the plaintiffs have failed to allege any constitutional violation—a necessary element to state a valid 1983 claim. *See Adickes v. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1958). While expressing no opinion as to the pleading sufficiencies of plaintiffs' first claim, I find defendants' second contention to be meritorious, thus entitling them to judgment as a matter of law.

Section 1983 provides that whoever, under color of state law, deprives any person of his constitutional rights shall be liable to the injured party. It is now settled, however, that § 1983 in and of itself does not provide a substantive basis for relief. Rather, it is essentially a procedural or remedial device through which a party may seek relief for the deprivation of a constitutional right. *Chapman v. Houston Welfare Rights Organization*, 441 U.S. 600, 615–620, 99 S.Ct. 1905, 1915-1917, 60 L.Ed.2d 508 (1979). Thus, in order to state a valid claim under § 1983, the pleader must allege an independent substantive

---

**3.** Plaintiffs argue that the better approach is to await a judicial determination concerning the revocation of their operating certificates before seeking a full evidentiary hearing concerning the termination of the Provider Agreements. They urge, therefore, that this hearing be adjourned *sine die.* In light of my Opinion, I need not address plaintiffs' postponement of this post-termination administrative review. I merely note that plaintiffs' insistence upon a formal pre-termination hearing is somewhat less compelling in light of their willingness to adjourn review of the HEW's action.

**4.** Plaintiffs seek an order requiring the defendants Robert P. Whalen, Barbara Blum, Richard A. Berman, William Liddle, Earl M. Collier, Jr., Nasry Michelin, William Steibel, Juanita Civillo and Eugene Battenfeld to produce any and all documents in their possession, custody, or control relating to the Kings Harbor Care Center, the Kings Harbor Manor Facility, Albert Schwartzberg and/or Sigmund Lefkowitz.

basis, grounded either in a federal constitutional or statutory right.[5] *Id.*

Although it proceeds under various theories, the essence of plaintiffs' complaint is that through HEW investigation, their health care facilities were found to be deficient and, as a result, Medicare and Medicaid funding was terminated prior to an administrative hearing. They conclude that they were thereby deprived of their property without benefit of procedural due process.

■ In my prior Opinion, from which no appeal was ever perfected,[6] I held that whatever property interests plaintiffs had in the continued operation of their business, these would be sufficiently protected by a post-termination hearing. Thus, the absence of a pre-termination hearing did not constitute a violation of plaintiff's procedural due process. Consequently, plaintiffs are estopped, whether it be under the doctrine of collateral estoppel or *res judicata,* from now asserting that this same conduct constitutes a constitutional deprivation in order to state a claim under § 1983. That was an issue and claim which has been fully argued and finally decided and cannot now be relitigated by the plaintiffs.

■ The classic definition of collateral estoppel provides that where a question of fact essential to a judgment is actually litigated and determined by a valid and final judgment, that determination is conclusive between the parties in a subsequent action based upon a different cause of action.[7]

■■ To be distinguished is the doctrine of res judicata which provides that when a claim has been adjudicated on the merits, the parties to the action are bound by the judgment and may not relitigate the same claim between themselves. Stated differently, collateral estoppel runs to issue preclusion while res judicata concerns claim preclusion.

The application of both doctrines to the instant claim is apparent. In dismissing plaintiffs' third, fourth and fifth claims, I found that a pre-termination administrative hearing was not mandated under the circumstances to protect plaintiffs' property interest. This finding was certainly necessary in determining the viability of these claims. Moreover, since plaintiffs have failed to appeal this finding, it stands as a final determination of the issue between the parties.

Plaintiffs' attempt to avoid the doctrine of collateral estoppel by urging that they have alleged two separate property interests in their complaint: the interest in the operation of their business unfettered by harassing HEW and DSS investigations; and their interest in the continued operation of their facilities *in futuro.* Plaintiffs argue that both interests require indepen-

---

**5.** There is some dispute, however, as to whether § 1983 provides a private cause of action for the deprivation, under color of state law, of any federal statutory right. Indeed, in *Chapman* the Chief Justice, Mr. Justice Powell and Mr. Justice Rehnquist had grave reservations with this expansive view of § 1983 adopted in the Court's Opinion penned by Mr. Justice Stevens. *Chapman v. Houston Welfare Rights Organization,* 441 U.S. 600, 623, 99 S.Ct. 1905, 1919, 60 L.Ed.2d 508 (1979) (Powell, Rehnquist, JJ., and Burger, Ch. J. concurring).

Suffice it to say that *Chapman,* however narrowly read, requires an independent constitutional claim before a 1983 action will lie.

**6.** Although plaintiffs filed a timely notice of appeal from the dismissal of their third, fourth and fifth claims in the Second Circuit, just six days prior to oral argument, plaintiffs voluntarily withdrew the appeal. Since defendants would not agree to a voluntary discontinuance unless it was "with prejudice," an order was entered in the Circuit Court on January 23, 1979 discontinuing the appeal with prejudice. Thus, my Opinion concerning the third, fourth and fifth claims now stands as a final judgment.

**7.** Collateral estoppel is applicable despite the fact that it is being applied within the confines of one action. Since the parties previously moved only as to plaintiffs' third, fourth and fifth claims, when these claims were dismissed, in effect they were severed from the first two claims. Thus, when plaintiffs failed to perfect their appeal as to the dismissed claims, and it was discontinued with prejudice, my determination as to these claims became a final judgment. And, for purposes of the doctrine, this final determination was as if it were reached in a separate action.

dent due process analysis. They conclude that since my earlier opinion addressed only those due process rights flowing from the termination of the facilities rather than from their unfettered operation, the doctrine of estoppel is not applicable.

This is at best a dubious distinction between the property interest asserted in Claim One and the interest asserted in the balance of plaintiffs' original complaint. The plaintiffs had but one property interest—the continued operation of their health care facilities. Any interest in the unfettered operation of the facilities, if indeed of constitutional proportion, was identical to their interest in their continued operation. Similarly, the investigative techniques employed by HEW and DSS were part and parcel of their respective decisions to terminate Medicare and Medicaid funding. To attempt to separate the investigation from the termination of funding with respect to due process interests, is simply legal slight of hand. Thus, plaintiffs' sole property interest will be sufficiently safeguarded if and when they choose to proceed with the post-termination administrative hearing previously provided for.[8]

An identical result obtains under the doctrine of res judicata. Clearly, plaintiffs' first claim, as did their third, fourth and fifth claims, seeks redress for alleged due process violations. Since I have previously found that no due process violations existed, the plaintiffs are bound by that final determination on the merits and cannot now attempt to relitigate their due process claim under the guise of an "independent" 1983 claim.

The fact that plaintiffs' first claim is identical to those previously disposed of is beyond dispute. Indeed, this conclusion is mandated by the Supreme Court's decision in *Chapman, supra,* wherein the Court held that § 1983 does not provide an independent substantive basis for relief. Thus, an alleged constitutional violation is a necessary predicate to any 1983 claim. In the case at bar, the constitutional violation alleged in plaintiffs' first, third, fourth and fifth claims is a deprivation of procedural due process. There being no substantive difference between plaintiffs' first claim and those previously disposed of, res judicata precludes relitigation of this claim.

Plaintiffs' second claim presents a somewhat more complex problem. As previously mentioned, the plaintiffs charge that defendants' conduct in terminating Medicare and Medicaid funding was the result of a conspiracy between the state and federal defendants to eliminate an excess medical facility in the metropolitan area. They argue that the National Health Planning Act, 42 U.S.C. §§ 300k *et seq.,* sets forth the procedures necessary to eliminate excess medical facilities which include:

(a) written notification to the target facility by New York's Health System Agency [hereinafter referred to as "HSA"];

(b) a study of the facility by the HSA;

(c) public hearings on closing the target facility as an excess health facility;

(d) the submission by the HSA of its recommendations concerning the facility to the State Health Planning and Development Agency; and

(e) further public hearings before that agency if requested by the target facility. *See generally,* 42 U.S.C. §§ 300n–1(b)(1), 300n–1(b)(8). Plaintiffs' reason that since none of these procedures have been followed in the instant action,[9] defendants'

---

**8.** Plaintiffs, in their Memorandum in opposition to defendants' motion, argue that their facilities have been "subjected to unequal, unconstitutional enforcement of the law." Plaintiffs' Memorandum at 11, 12–13. This attempt to create an equal protection issue must fail. First, the complaint is void of any reference, vague or otherwise, to a claim based upon equal protection. This is the first time plaintiffs have attempted to invoke the equal protec-

tion clause. Second, there are no factual allegations from which an equal protection claim could be culled. Indeed, even the most fertile legal mind would be hard pressed to do so in the instant case. And for these reasons plaintiffs' equal protection argument must be summarily dismissed.

**9.** This allegation is not particularly accurate, however, since the plaintiffs were notified of HEW's action prior to the terminations. See

conduct constitutes a violation of the Act for which plaintiffs are entitled to seek redress in federal court.

In establishing its second claim, plaintiffs rely exclusively upon the holding of the Honorable Richard Owen, District Judge, in *Park East Corporation v. Califano,* 435 F.Supp. 46 (S.D.N.Y.1977). In *Park East* the plaintiff, a small proprietary hospital, objected to the HEW's decision to terminate it as a provider of Medicare/Medicaid services. The decision to terminate the funding was the result of certain deficiencies uncovered by the HEW which created "a serious life threatening situation." It was decided that as a result of the exigent circumstances any administrative hearing would be conducted after the termination of the facility. Thereafter, plaintiff commenced an action against HEW and DSS charging, *inter alia,* that the termination failed to meet the procedural requirements set forth in the National Health Planning Act.

When the federal defendants settled with the plaintiff, the question became whether plaintiff's allegations under the National Health Planning Act stated a federal claim. Judge Owen held that "[w]hile the Act does not expressly provide a remedy to a party aggrieved by reason of non-compliance, a federal remedy must be implied, given Congress' clear intent to have all health planning realized pursuant to the Act." 435 F.Supp. at 50. Although noting that the Act does not "affect a state's inherent po-

lice power to regulate hospitals and insure their compliance with various state health and hospital codes," Judge Owen held that termination of the health facility must await the perfection of prior procedural safeguards. His decision, however, was based, in large part, upon the finding that the continued operation of the facility posed no immediate danger to the life, health and safety of the patients. *Id.* at 51.

■ The threshold question, therefore, is whether plaintiffs' second claim, alleging violations of the National Health Planning Act, presents a claim cognizable in federal court. I am inclined to agree with Judge Owen's analysis in *Park East* concerning the Act. It would appear that although no federal remedy is expressly granted, a remedy must be implied to insure that Congress's purpose in passing the Act is given effect.[10] *See J. I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964).

This, however, is not the end of my inquiry. In my earlier Opinion, I did my best to make it clear that the health and safety of the aged and infirm patients residing at plaintiffs' facilities were "paramount in my considerations" in determining that HEW's interest in the health and safety of these patients outweighed the plaintiffs' interest in continuing to receive funding from Medicare/Medicaid. 453 F.Supp. at 1046–47. It is evident, however, that the life, health and safety of patients was an issue conspicuous-

453 F.Supp. at 1043. Moreover, plaintiffs were afforded certain procedural safeguards not contemplated under the Act. *Id.* at 1046–47.

**10.** The defendants argue that plaintiffs' second claim is inextricably woven into their 1983 claim and as such is precluded under the Supreme Court's recent pronouncement in *Chapman v. Houston Welfare Rights Organization, supra.* The *Chapman* holding, however, is simply inapplicable to this issue.

The question presented in *Chapman* was whether a District Court's jurisdiction over civil actions claiming a deprivation of rights secured by the United States Constitution encompassed a claim that a state welfare regulation was invalid because it conflicted with the Social Security Act. The Court held that it did not.

More particularly, the plaintiff argued that § 1983 provided a substantive basis for a federal claim brought under 28 U.S.C. § 1343(3) and (4). The Court disagreed and held that the Social Security Act, 42 U.S.C. § 606(e)(1), also failed to provide for equal rights or civil rights as required under the jurisdictional provisions relied upon.

The instant case, however, presents quite a different situation. Here we are dealing with the applicability of a federal statute. Although it is arguable whether the statute implies a private remedy, *Park East Corporation, supra,* 435 F.Supp. at 50, and consequently whether federal question jurisdiction obtains, the instant action is not precluded by *Chapman.*

ly absent from the *Park East* case. 435 F.Supp. at 51. Indeed, the entitlement to a pre-termination hearing and the other procedural safeguards enunciated in the Act was predicated upon the absence of any life threatening conditions. Thus, the question of pre-termination procedural safeguards where the question of the life, health and safety of patients is in issue was not before Judge Owen in *Park East.* Moreover, investigation reveals no reported cases on this precise issue.

■ There is no doubt that plaintiffs had a property interest in their expectation of continued participation in the Medicare and Medicaid programs. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). It is equally true that the procedural safeguards enumerated in the National Health Planning Act are rooted in the Due Process Clause and were intended to provide procedural due process to those health facilities marked for elimination. *Park East, supra,* 435 F.Supp. at 54–55. Thus, where a plaintiff seeks redress for alleged procedural violations of the Act, in point of fact, the claim is for the deprivation of procedural due process.

■ In construing the procedural requirements of the Due Process Clause, it is well settled that " '[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation.' " *Case v. Weinberger,* 523 F.2d 602, 606 (2d Cir. 1975), *quoting Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Indeed, when all embellishments are shed, the fundamental dictate of procedural due process is affording notice and an opportunity to be heard to the individual whose property interest is at stake. However, the type of notice to be given and the nature of the hearing provided depend ultimately upon the competing interests involved. *Goss v. Lopez,* 419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975).

11. This informal review fell short of a full evidentiary hearing which, the Court observed, should generally be afforded prior to the termination of a property interest. 523 F.2d at 606.

■ Thus, the procedural requirements of the National Health Planning Act, insofar as they are of constitutional import, may not be imposed in a vacuum. Rather, they must be tempered by striking a balance between the government's interest and the nature of the individual interest being affected by the governmental action. *Case v. Weinberger, supra,* 523 F.2d at 606.

■ Applying these principles to the case at bar, it is evident that the precise procedural requirements of the Act need not be met to insure procedural due process. What is sufficient to vindicate procedural due process, however, is a question to which I now turn.

In *Case v. Weinberger,* 523 F.2d 602 (2d Cir. 1975), the Second Circuit was faced with the issue of whether a full evidentiary hearing was necessary prior to the decertification of a nursing home as a skilled nursing facility under the Medicaid program. The plaintiff, the Case Nursing Home, was found by the HEW to have Life Safety Code violations which necessarily adversely affected the health and safety of the patients. As a result, the HEW decided to terminate the facility's Provider Agreement prior to an administrative hearing. Before initiating the termination of the Agreement, however, the HEW notified the plaintiff's owner and operator, Mrs. Case, of the deficiencies and supplied her with copies of the survey reports setting forth these deficiencies. In addition, the plaintiff was informed that she could seek a review, albeit an informal review,[11] of the HEW's initial decision that the health and safety of the patients was in jeopardy.

The Court properly observed that while ordinarily the recipient of a governmental benefit should be given a hearing before that benefit is terminated, "where certain emergency situations which threaten the public safety exist and where the individual interest is of less importance, 'an official

However, under the circumstances when tested against the facts of the case, it was found to be sufficient.

body can take summary action pending a later hearing.'" *Weinberger, supra,* 523 F.2d at 606, *quoting Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971).

While not passing upon whether the situation was sufficiently exigent to warrant summary action, the Court did find that the prior notice and informal hearing provided to Mrs. Case were sufficient to satisfy the dictates of due process. The Court reasoned that the sufficiency of the procedures employed prior to the termination, although short of a full evidentiary hearing, "must be measured, in light of the government's interest [in the health and safety of the patients], against Mrs. Case's interest in continued participation in the Medicaid program." *Id.* at 607.[12] Upon balance, the Court concluded that the government's interest must prevail and affirmed the HEW's summary action.

Turning to the case at bar it is clear that HEW's conduct fully comports with those procedures set forth in *Weinberger.* Upon discovery of the deficiencies at the facility, HEW notified plaintiffs of its intention not to renew the Provider Agreement and they were supplied with copies of the report of the HEW inspectors. Similarly, DSS also notified plaintiffs of its decision not to renew the Medicaid Provider Agreement. In addition, plaintiffs twice met with HEW representatives concerning the alleged deficiencies and were given the opportunity to reply to HEW's report. Thereafter, upon the assurance of plaintiffs that the alleged deficiencies were cured, the facility was reinspected and plaintiffs appeared before the decision maker to argue their position. To be sure, these procedural safeguards were well within those outlined by this Circuit in *Weinberger.*

Furthermore, here, unlike *Weinberger,* there was a prior finding that the health and safety of the patients was indeed a real concern and not merely a cry of wolf from HEW. *Compare Schwartzberg v. Califano, supra,* 453 F.Supp. at 1046–47 *with Park East Corp. v. Califano, supra,* 435 F.Supp. at 51. Thus, the governmental interests in the instant action are even more compelling then those presented in *Weinberger.*

The question remains, however, whether summary judgment is appropriate in the case at bar. Rule 56 provides that summary judgment is to be granted when it is demonstrated that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

�In It is clear that in determining whether to grant a motion for summary judgment, a Judge cannot "try issues of fact; [he] can only determine whether there are issues to be tried." *American Mfrs. Mut. Ins. Co. v. American Broadcasting-Paramount Theatres, Inc.,* 388 F.2d 272, 279 (2d Cir. 1967). It is equally clear, however, that "[s]ummary judgment . . . is not necessarily precluded merely because the legal issue is complex." *Securities and Exchange Commission v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir. 1978).

▮ Plaintiffs' second claim appears, at first blush, to present many factual questions concerning the precise procedural safeguards previously extended to plaintiffs. However, this case was the subject of a prior hearing from which emanated my Opinion of June, 1978, 453 F.Supp. 1042, in which I found, *inter alia,* that certain procedural safeguards were extended to plaintiffs. *Id.* at 1046–47. Indeed, plaintiffs did not contest that these safeguards were actually provided, but rather, they argued that they were insufficient under the circumstances. I disagreed and held that under *Weinberger,* due process was satisfied by these informal pre-termination procedures. *Id.*

---

**12.** In defining Mrs. Case's interests which were at stake, the Court found that the fact that a nursing facility "needs" patients to operate and that without Medicaid participation a facility cannot survive were incidental. These benefits result from nothing more than a statutory business relationship. 523 F.2d at 607. Mrs. Case's sole property interest was in her expectation of continued participation in the Medicaid program. *Id.*

It is clear that plaintiffs cannot now allege that these informal pre-termination procedures were not in fact provided. To be sure, no such allegation has been made. Nor can they now argue that they were not afforded procedural due process prior to the terminations. Indeed, this finding became final when plaintiffs failed to perfect their appeal of my prior Opinion and they are hereby estopped from relitigating that issue.

Consequently, there are no issues of triable fact and, under *Weinberger* and my prior ruling in the instant action, defendants are entitled to judgment as a matter of law.

Accordingly, defendants' motion for summary judgment on plaintiffs' first and second claims is granted; plaintiffs' motions seeking leave to amend their complaint and the production of documents are denied and their motion for the substitution of counsel is granted insofar as the instant motion is concerned.